**SO ORDERED.**

**SIGNED this 14 day of April, 2011.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION**

IN RE:

**THE LEGACY AT JORDAN LAKE, LLC**        **CHAPTER 11**
                                           **CASE NO. 10-03317-8-RDD**
    **DEBTOR**

**ORDER DENYING CONFIRMATION OF
CHAPTER 11 PLAN OF REORGANIZATION**

Pending before the Court is the proposed Plan of Reorganization filed by The Legacy at Jordan Lake, LLC (herein referred to as the "Debtor" or "Legacy") on July 23, 2010 (the "Plan") and the Disclosure Statement filed by the Debtor on July 23, 2010 (the "Disclosure Statement"), the Bankruptcy Administrator's Response to Debtor's Plan of Reorganization and Disclosure Statement filed by the Bankruptcy Administrator on September 16, 2010 (the "BA Response"), the Objection of Capital Bank to Debtor's Disclosure Statement and Chapter 11 Plan of Reorganization and Incorporated Memorandum of Law in Support of Objection filed by Capital Bank ("Capital") on September 16, 2010 (the "Capital Objection"), and the Objection to Plan of Reorganization and Disclosure Statement filed by Scott F. and Lynn M. Gardner on September 16, 2010 (the "Gardner

Objection").[1] The Court began a hearing in Wilson, North Carolina on the confirmation of the Plan and final approval of the Disclosure Statement and the responses thereto on February 23, 2011.[2]

The Debtor was formed in 2005 to develop six hundred twenty-eight (628) acres of real property, located in Chatham County, North Carolina near Jordan Lake, into a four hundred sixty-three (463) residential lot subdivision to be constructed in six (6) phases (the "Project").[3] The vision of the Debtor was to develop a gated community with meadows and walking trails. Amenities in the Project were to include a clubhouse, pools, spa, short irons golf facility, tennis courts, walking paths and trails, waterfalls, and mini-parks.

The Debtor commenced selling both developed and undeveloped lots in Phase I in 2005. Of the one hundred five (105) platted lots in Phase I, fifty-four (54) lots were purchased by builders and several lots were purchased by individuals directly from the Debtor. Today, the Debtor owns thirty-seven (37) lots[4] in Phase I that are platted and ready for sale. In addition, the lots in Phase II and Phase III are platted but the infrastructure is not complete. The remaining phases are still raw undeveloped land. The Debtor contends that lots in Phase II could be offered for sale with a

---

[1] The Gardner Objection requests that it be treated as a ballot rejecting the proposed Plan but does not state the underlying basis for the objection.

[2] The hearing commenced on February 23, 2011 and additional testimony was presented on February 25, 2011, March 7, 2011, and March 10, 2011.

[3] The Real Property is located approximately thirty (30) minutes from Raleigh, twenty (20) minutes from Chapel Hill, and thirty (30) minutes from Durham.
Although the Debtor proposed to develop and sell lots in six (6) phases of development, this opinion also references a Phase VII, which consists of amenity projects the Debtor proposed to transfer to the Homeowners' Association ("HOA").

[4] The Court notes that Schedule A filed by the Debtor reflects that the Debtor owns thirty-eight (38) completed single-family lots in Phase I.

relatively minimal capital expenditure based on the previous work completed by the Debtor. See Disclosure Statement, Art. III, p. 5.

Capital was listed as a secured creditor on Schedule D and is owed approximately seventeen million, five hundred thousand dollars ($17,500,000.00).[5] The Debtor contends that because of certain unilateral acts of Capital, the Debtor has been unable to complete Phase I, sell any platted lots in Phase II, or move forward with the development of lots in Phases III - VI.

Pursuant to the terms of the Plan, the Debtor proposes three treatment options for the claims of Capital. The Plan permits the Debtor[6] to select which option it prefers. See Plan, p. 12

Pursuant to Option One, the Debtor would pay Capital a lump sum payment of fifty percent (50%) of its secured claim within one hundred eighty (180) days of the effective date. If the Debtor fails to pay the claim in full within one hundred eighty (180) days, the Debtor would develop, market, and sell lots. From the lot sales, Capital would receive forty percent (40%) of the net sales

---

[5] During the cross examination of Holland C. Gaines on March 10, 2011, he testified that he had recently seen documentation from Capital that the amount of its secured claim is approximately eighteen million, two hundred twenty-five thousand dollars ($18,225,000.00).

In addition, the Debtor executed a promissory note in 2006 in the principal amount of five million, two hundred ninety-five thousand, five hundred four dollars and ninety-five cents ($5,295,504.95) for the purpose of establishing an irrevocable letter of credit in favor of Chatham County. Chatham County could draw on the letter of credit if the Debtor failed to complete certain improvements within Phases II and III of the project. If Chatham County elected to draw upon the letter of credit, the promissory note provides that payments are due upon demand at an interest rate of eight and twenty-five one hundreths percent (8.25%) per annum. The promissory note is secured by a deed of trust excluding certain lots which had been sold prior to its execution. Based on the Plan, Chatham County had reduced the letter of credit requirement to four million, one hundred thirty-eight thousand, five hundred eight dollars ($4,138,508.00).

[6] The Plan provides on page 12 the following: "ADDITIONAL TERMS: The following additional terms shall apply to all of the above options, *regardless of which of the above options is selected by the Debtor*." (emphasis added). Subsection (ii) under the Additional Terms section states "[t]he Debtor shall provide Capital Bank with notice of which of the above options it has elected by the Effective Date." See Plan, p. 12.

3

proceeds. Thirty-five percent (35%) of the net sales proceeds would be earmarked for construction of the amenities and the remaining twenty-five percent (25%) of the net sales proceeds would be retained by the Debtor for continued development in the subdivision. The Plan does not provide a minimum sales price for lots under Option 1.

If the Debtor elects Option 1, after the completion of the amenities, the Debtor proposes to pay to Capital seventy-five percent (75%) of the net sales price for each lot and retain the remaining twenty-five percent (25%) for its operational costs. The existing amenities would be immediately transferred to the HOA free and clear of Capital's lien and Phase VII amenities will be transferred to the HOA at a later date. Furthermore, the Debtor would be granted access to its money market account to pay its bills. Capital admitted in its Objection that use of this account is currently restricted.

Under Option Two, the Debtor proposes to surrender certain lots in full satisfaction of all indebtedness owed to Capital. The Debtor would retain Lots 2, 4, 5, 7, 17, 21, 23, 43, 67, and 70 in Phase I and surrender the remaining lots in Phase I, the partially developed lots and raw land in Phases II and III, and the raw land in Phase IV. The Debtor would retain the raw land in Phase V and Phase VI. Any property retained by the Debtor would be free and clear of all liens. Furthermore, the Debtor would transfer Phase VII to the HOA and such transfer would be free and clear of any liens.

Option Three provides that the Debtor surrender to Capital all raw land and developed lots in Phases I - VI in full satisfaction of its claims. The Debtor would transfer Phase VII to the HOA and such transfer would be free and clear of any liens of Capital. As part of Option Three, Capital would be required to pay the Debtor eight million dollars ($8,000,000.00) and release the funds, in

the amount of approximately five hundred thousand dollars ($500,000.00), held in the Debtor's money market account.

Capital objects to the treatment of its claims and to the Disclosure Statement. It contends that the Disclosure Statement fails to provide sufficient information about how the Debtor intends to implement its Plan and fails to include adequate information as required by Section 1125 of the Bankruptcy Code. In addition, Capital states that the Plan improperly prefers equity holders; is not feasible; does not satisfy the best interest of creditors test in that it fails to provide Capital with as much as it would receive in a liquidation; is not fair and equitable; improperly releases the collateral of Capital without compensation or its consent; and improperly protects non-debtor guarantors from potential liability in connection with Capital's claims.

The BA Response provided a synopsis of the proposed treatment of Capital's claims and recognized that Capital was likely to object to the Plan. The Bankruptcy Administrator noted that the Plan provided that unsecured creditors are to be paid in full, with payments of twelve thousand, four hundred sixteen dollars and sixty-three cents ($12,416.63) per quarter for five (5) years. Based on the value of the Project espoused by the Debtor, there would be substantial equity in the Project, thereby, requiring payment in full to unsecured creditors plus interest. The Plan fails to provide that interest will be paid to the unsecured creditors' class. In addition to his objection regarding the treatment of unsecured creditors, the Bankruptcy Administrator contends that the Plan is not feasible.

Option Two and Option Three contain an exchange of all or a portion of the Project, the real estate collateral or "dirt," in full satisfaction of debt owed to Capital. The proposed exchanges preclude any recovery from Capital on a deficiency claims or claims against any of the guarantors

should Capital not recover its claims in full from the Debtor. See Plan, p. 12 (providing "[u]pon the Effective Date, the Debtor, Capital Bank, and the Guarantors of the Capital Bank obligations shall execute mutual releases of each other for all claims...").

The Debtor presented testimony and evidence from John M. McBrayer, who was qualified by the Debtor as an expert in the field of real estate appraisals; Joseph C. Rasberry, who was qualified to testify as an expert in real estate valuations; Patrick LaJeunesse, the real estate sales agent for the Debtor; Holland C. Gaines, the managing member of the Debtor; and S. Alan Gaines, a member of the Debtor.

During the course of the hearing, the Debtor abandoned Plan Options One and Three. For the reasons set forth herein, confirmation of the Plan based on the proposed treatment of Capital under Option Two is **DENIED.**

## DISCUSSION

In order for the Plan to be confirmed, the Plan must meet the requirements of Section 1129 of the Bankruptcy Code. Since Capital has voted against the proposed Plan, 11 U.S.C. § 1129(b) must be satisfied before the Debtor is permitted to cramdown Capital's claim. Therefore, the Plan must not unfairly discriminate against one class of creditors and it must be fair and equitable to Capital. 11 U.S.C. § 1129(b). If the Debtor is able to meet these requirements, the Debtor can cramdown the claim of Capital and the Court could confirm the Plan over Capital's objection. In order for the Plan to be considered fair and equitable, it must provide Capital with the "indubitable equivalent" of its claim. 11 U.S.C. § 1129(b)(2)(A)(iii). See also *In re Bannerman Holdings, LLC*, Case No. 10-01053-8-SWH (Bankr. E.D.N.C. October 20, 2010); *In re Fazekas*, Case No. 92-02262-8-JRL (Bankr. E.D.N.C. May 17, 1993).

The indubitable equivalent requirement in Section 1129(b)(2)(A)(iii) was added to the Bankruptcy Code as part of the Bankruptcy Reform Act of 1978. See 124 Cong. Rec. 32407 (1978). This phrase was adopted from the *In re Murel Holding Corporation* case decided in 1935 by Judge Learned Hand. 75 F.2d 941, 942 (2d Cir. 1935). In that case, Judge Hand recognized that a secured creditor should not be deprived of its interest in collateral "unless a substitute of the most indubitable equivalence" is provided. *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935). This Court has recognized the importance of taking a conservative approach to valuation where a Debtor seeks to confirm a plan of reorganization by surrendering a portion of real property collateral in exchange for the full satisfaction of a debt owed to the secured creditor. *In re Bannerman*, Case No. 10-01053-8-SWH at 7-8 (Bankr. E.D.N.C. October 20, 2010).

In order to determine whether value exists to satisfy the indubitable equivalent requirement for a cramdown, the specific facts of each case should be considered and the litigants should "focus [their] evidentiary presentations on the value of the surrendered property." *In re Bannerman*, Case No. 10-01053-8-SWH at 16-17. The Bankruptcy Court for the Northern District of Idaho found that in an uncertain real estate market, it is doubtful such a plan would provide "the indubitable equivalent of its claim unless the appraised value of the property, *demonstrated by competent proof,* far exceeds the amount of the debt to be paid." *In re Martindale*, 125 B.R. 32, 38 (Bankr. N.D. Id. 1991)(emphasis added).

Courts have not applied the same evidentiary standard in order to establish the indubitable equivalent required by Section 1129(b)(2)(A)(iii) of the Bankruptcy Code. *In re Bannerman*, Case No. 10-01053-8-SWH at 5-6 (Bankr. E.D.N.C. October 20, 2010)(citations omitted)(determining that because "even the higher 'clear and convincing' standard [of proof was] satisfied," the court

7

need not consider whether the appropriate evidentiary standard should be the clear and convincing or the lower, preponderance of the evidence standard.). It is clear that at a minimum, the preponderance of evidence burden of proof standard is required. *Id.* In this case, the Debtor has failed to present sufficient evidence to the Court that would even satisfy that minimum standard.

In this case, the Debtor presented extensive testimony regarding the value of the Project. John M. McBrayer, who was called by the Debtor as an adverse witness, testified in connection to his appraisal[7] completed for Capital dated December 11, 2009 and documented in his Report of December 17, 2009 (the "2009 McBrayer Appraisal"). Joseph Rasberry, MAI appraiser, testified as to his valuation on his Restricted Use Report Real Estate Analysis dated January 24, 2011 (the "2011 Rasberry Analysis") and his undated letter[8] to Laurie Biggs, counsel for the Debtor. Holland C. Gaines testified as to his opinion of valuation based on his experience as a developer and as the managing member of the Debtor. The focus of testimony from each witness was the value of the Project as a whole. No testimony was offered to the Court that valued the portions of the Project that the Debtor intended to surrender under Option Two.[9] The testimony presented focused solely

---

[7] The cover sheet on the appraisal provides that it was prepared by Jessica L. Hartye and John M. McBrayer. Both are North Carolina Certified General Appraisers.

[8] This letter notes that he used a discounted cash flow analysis for the platted and partially developed lots in Phase II and Phase III as opposed to the sales comparison approach taken by Mr. McBrayer in connection with the three hundred ninety and five hundred fifty-one thousandths (390.551) acres of "excess" land in his February 15, 2011 Appraisal and Report (the "2011 McBrayer Appraisal"). See Legacy Ex. 61. Mr. Rasberry believes that the discounted cash flow approach is more appropriate for the Project as described in the 2011 Rasberry Analysis.

[9] During the course of the cross-exam of Holland C. Gaines, he conceded that the Debtor was looking to reorganize under Option Two of the Plan and also expressed a hope that Capital would work with the Debtor. Gaines testified his opinion of the fair market value of the Project was thirty-seven million dollars ($37,000,000.00).

8

on the total value of the lots in Phase I, partially developed lots in Phases II and III, and the remaining undeveloped land in the Project.

Mr. Gaines testified that the Debtor began having difficulties with Capital in 2007. However, based on a list of lot and home sales shown on Legacy Exhibit 28, three (3) lots closed between March 7, 2008 and December 29, 2008. There were also two (2) home sales between January 31, 2008 and May 28, 2008. There were two (2) lot sales in 2009 and no lots or homes were sold by the Debtor in 2010. Presently, the Debtor has thirty-seven (37) lots remaining in Phase I. It intends to surrender twenty-seven (27) lots in Phase I to Capital and keep the remaining ten (10). The Debtor also proposes to keep the raw land in Phase V and Phase VI and to surrender Phase II, Phase III, and Phase IV to Capital. The Debtor proposes that Phase VII be transferred to the HOA.

Testimony was provided that a number of the lots with constructed homes on them have been subject to foreclosure proceedings. Based on the Local Market Update for Chatham County, when comparing January 2011 sales to January 2010 sales, the closed sales are down seven and three tenths percent (7.3%). See Legacy Ex. 64. Although the average sales price for this time frame has increased to three hundred eleven thousand, four hundred forty-six dollars ($311,446.00), this amount is still less than half of the list price of the homes in the Project and the proposed lot prices for the Project are almost one third (1/3rd) to two-thirds (2/3rd) of that amount.

The Local Market Update for Wake County shows a decline in sales by eleven and seven tenths percent (11.7%) for the period of January 2010 through January 2011. Also during that time frame, the average sales price of a home was two hundred forty-nine thousand, one hundred seventy-six dollars ($249,176.00). See Legacy Ex. 64.

As to Durham - South, there was an increase in residential sales for the period between January 2010 through January 2011 by ten and nine tenths percent (10.9%) and the average sales price was two hundred thirty five thousand twenty seven dollars ($235,027.00). The Project was developed for construction of homes ranging from six hundred thousand dollars ($600,000.00) to one million dollars ($1,000,000.00). This evidence shows that the market for highly priced homes is non-existent. Otherwise, the average sale price for the surrounding areas would be much higher.

The TARR Report, a Triangle Area Residential Realty compilation of MLS Reports, issued for the 2010 fourth quarter shows that there is a thirteen (13) month supply of housing on the market just within Chatham County. See Legacy Ex. 26. Testimony was offered that the housing market has improved as to the lower price ranges but that higher priced homes will be the last to improve. Annual foreclosure filings in the county increased by eight percent (8%) when comparing 2010 to 2009. See Legacy Ex. 26. Based on the TARR Report, the average 2010 closing price was three hundred six thousand, three hundred dollars ($306,300.00) as there were only twenty-two (22) new homes sold in 2010 in Chatham County with a sales price between six hundred thousand dollars ($600,000.00) and one million dollars ($1,000,000.00).[10] See Legacy Ex. 26.

---

[10] Also submitted into evidence by the Debtor was a Market Opportunity Research Enterprises Report for the period of October 2010 through December 2010 which provides a detailed breakdown of the new home sales in Chatham County. See Legacy Ex. 27. Page four of that report provides the year-to-date 2010 sales, including: seven (7) new homes between six hundred thousand dollars ($600,000.00) and six hundred ninety-nine thousand dollars ($699,000.00); seven (7) new homes between seven hundred thousand dollars ($700,000.00) and seven hundred ninety-nine thousand dollars ($799,000.00); two (2) new homes between eight hundred thousand dollars ($800,000.00) and eight hundred ninety-nine thousand dollars ($899,000.00); four (4) new homes between nine hundred thousand dollars($900,000.00) and nine hundred ninety-nine thousand dollars ($999,000.00); and two (2) new homes in excess of one million dollars ($1,000,000.00). See Legacy Ex. 27.

Furthermore, the TARR Report notes that of the houses listed for sale in the Project, there were nine (9) fourth quarter showings in 2010. The TARR Report shows the average list price of the Project homes listed is nine hundred twenty-seven thousand six hundred eighty-six dollars ($927,686.00). These houses had been on the market for an average of two hundred four (204) days.

In addition to the 2009 McBrayer Appraisal, Mr. McBrayer and Ms. Hartye prepared an appraisal for Capital on August 12, 2008, documented by a report dated August 28, 2008 (the "2008 McBrayer Appraisal"). The 2008 McBrayer Appraisal valued forty-three (43) lots in Phase I at six million, three hundred ten thousand dollars ($6,310,000.00) and three hundred ninety and five hundred fifty-one thousandths (390.551) acres of excess land at twenty-eight million, three hundred sixty thousand dollars ($28,360,000.00) for a total value of thirty-four million, six hundred seventy thousand dollars ($34,670,000.00). Approximately sixteen (16) months later, the 2009 McBrayer Appraisal showed a decline in the value of the property. The 2009 McBrayer Appraisal valued thirty-nine (39) lots and the remaining three hundred ninety and five hundred fifty-one thousandths (390.551) acres of raw land. The remaining lots in Phase I were valued at four million, four hundred ten thousand dollars ($4,410,000.00) and the raw land was valued at twenty-four million sixty thousand dollars ($24,060,000.00) for a total value of twenty-eight million, four hundred seventy thousand dollars ($28,470,000.00). On page 5 of the 2009 McBrayer Appraisal, Mr. McBrayer addresses the proposed improvements and his assumptions. There he says:

> Upon completion, the amenity package will include a Club Manor house with a full spa, exercise rooms, gym facilities, indoor heated pool, outdoor resort-style pool with poolside grill, lap pool and full service restaurant. In addition, the amenity area will include tennis courts, a playground area, a multi-purpose sports court with pavilion snack area and adjustable overhead cover, short irons golf course, 8 miles of walking and bike trails, 4 miles of sidewalks, gazebos and picnic areas throughout the development. As of the date of this appraisal, the short irons golf course has been completed. Phase [I] of the amenity package includes the playground, two

tennis courts, outdoor lap pool and cabana with restaurant. Construction of Phase [I] of the amenity package has been on hold for the past year, but is expected to begin in the near future. Remaining amenity improvements will reportedly be constructed once the first phase is complete, with the final tennis court and spa being the last items constructed. The cabana, spa, tennis courts, and short irons golf amenities will not be conveyed to the subdivision homeowner's association and will remain privately owned. Since the subject lots will benefit from the proposed amenity package, our values estimated in this appraisal are based on the reasonable assumption that the above-described amenity package will be completed as proposed, and in a timely manner. *We caution the reader that our analysis is based on this extraordinary assumption [that the proposed improvements will be completed] and that changes to this assumption may significantly affect our conclusion on value.*

2009 McBrayer Appraisal, p. 5. (emphasis in original).

In addition, Mr. McBrayer provided in his 2009 McBrayer Appraisal an assumption that he relied upon as to the prospective price ranges of the homes to be constructed in the development, More specifically, he stated:

Recent home sales in the subject subdivision have ranged from $640,800 to $1,553,000. However, we note the recent sale of Lot #87 (at $640,000) in November 2009 appears to be a distressed sale from Fidelity Bank to an individual. In addition, two other home sales in 2009 at $860,000 (Lot #20) and $1,100,000 (Lot #11) were from Capital Bank to individuals. The developer of the subdivision indicates that moving forward with the existing Phase 1 lots, home prices will likely be between $700,000 and $1,000,000. Our values estimated in this report are based on the extraordinary assumption that the projected home prices for the subjects vacant lots in Phase 1 will generally range between $700,000 and $1,000,000, with an average projected home price of $850,000 based on the projected home prices and recent home sales in the subject subdivision. *We caution the reader that our analysis is based on this assumption and that changes to this assumption may significantly affect our conclusions of value.*

2009 McBrayer Appraisal, p. 6. (emphasis in original).

Considering the market reports provided by the Debtor, it appears that the current market is not supporting the sales of homes at this price point. Therefore, careful consideration should be given to the cautionary notations in the 2009 McBrayer Appraisal.

Mr. McBrayer also completed the 2011 McBrayer Appraisal where he determined the market value of a fee simple interest in the Project based on its "as-is" condition at seventeen million dollars ($17,000,000.00). The appraisal assumed that projected home prices for the vacant lots would be between six hundred thousand dollars ($600,000.00) and one million dollars ($1,000,000.00). To assist him in calculating the market value of the Project, he considered information provided to him, including the Debtor's projection of lot prices, the rate of absorption, and the remaining costs of development for the entire subdivision.

Mr. McBrayer stated that he prepared a Discounted Sellout Analysis based on the proforma provided by the Debtor and a Discounted Sellout Analysis based upon the Debtor's projected lot prices and the costs of development but with an extended absorption period of eight (8) years. See Captial Ex. 18. To reconcile these values and reach his valuation of seventeen million dollars ($17,000,000.00), Mr. McBrayer "estimated [the] aggregate value of the Discounted Sellout of the existing Phase I lots plus the vacant land (including credit for amenities and infrastructure in place)." *Id.*

The 2011 Rasberry Analysis shows a market value of thirty-one million, seven hundred thousand dollars ($31,700,000.00). He states that there are no extraordinary assumptions or hypothetical conditions tied to his valuation. The purpose of this valuation was for "mortgage financing" and provides only basic property identification, appraisal statements, and value conclusions. Mr. Rasberry utilized the income approach in determining his value of the Project. However, during his testimony, Mr. Rasberry stated that Mr. Gaines told him a little over six million dollars ($6,000,000.00) was needed to complete the amenities, streets, and capital improvements at the Project. Mr. Rasberry stated that it was his understanding from Mr. Gaines that Mr. Gaines

would be providing the funding in connection with finishing out the Project.[11] He further testified that he had not seen the proforma of the Debtor which provided that three million, five hundred thousand dollars ($3,500,000.00) would be needed for the amenities and that an additional eleven million, seven hundred thousand dollars ($11,700,000.00) was needed to complete the remaining infrastructure and capital improvements.

If the proforma of the Debtor was accurate and the Debtor needed approximately fifteen million dollars ($15,000,000.00) to complete the Project, Mr. Rasberry stated that his valuation would need to be reduced by nine million dollars ($9,000,000.00). Therefore, with this adjustment, his valuation would be approximately twenty-two million, seven hundred thousand dollars ($22,700,000.00), substantially less than the 2009 McBrayer Appraisal. As such, it is only logical for the Court to surmise that the completion of the amenities and any infrastructure would increase lot values. However, the Plan provides for the surrender of the Project in an "as is" condition without the Debtor needing to construct any additional amenities. Mr. Rasberry's analysis did not offer a valuation based on the "as is" condition of the Project without the contribution of approximately nine million dollars ($9,000,000.00) required to complete construction of infrastructure and the amenities. Therefore, the Court can give little weight to Mr. Rasberry's opinion of value.

The question before this Court is whether there is sufficient value in the property to be surrendered to provide Capital with the indubitable equivalent of its claims. In *Bannerman*, Judge Humrickhouse undertook a "substantial extrapolation" to determine value based on the fact that the

---

[11] Mr. Rasberry also stated that in determining his cash flows, he was informed by Mr. Gaines that six million, five hundred thousand dollars ($6,500,000.00) had already been spent on the project.

appraisals admitted into evidence failed to provide a value on the specific units surrendered. Case No. 10-01053-8-SWH at 9. However, the analysis in *Bannerman* is distinguishable from the facts in this case. *Bannerman* involved a condominium development where all of the units and the improvements were completed at the time of confirmation. *Id*. at 13. Here the Debtor is attempting to surrender lots in various stages of development and raw land. Unlike some similarities that can be drawn between condominiums in the same building, each parcel of land in the Project is distinctly different and unique.

At the hearing, there was extensive testimony about "A Lots," "B Lots," and "C Lots." The Debtor described "A Lots" as those lots that are most desirable; "B Lots" are lots that do not stand out; and "C Lots" are those lots that are usually the lowest in price and least desirable. No testimony was offered about the difference in value of "A Lots" versus "B Lots" versus "C Lots." Although the Debtor recognized the availability of different types of lots, in its analysis to the Court, it presented a "Middle of the Road" approach to valuation. Essentially, for Phases II - VI, the Debtor averages the lot prices listed from the 2009 McBrayer Appraisal and the 2011 Rasberry Analysis. Then, the Debtor values each lot at the same price. See Legacy Ex. 78. This averaging approach is inconsistent with the testimony that certain lots are, in fact, more desirable and quite possibly more valuable.

In addition, there was no credible evidence about how the valuation of lots would be impacted by the Debtor and Capital competing against one another for lot sales in the Project. Such competition would usually result in lower listing and sales prices. However, Mr. Rasberry testified that he believed that having the Debtor and Capital sell lots at the same time could be a win-win situation as they would be "partners." However, the Court is unable to see how two (2) parties in

competition with each other would create a partnership which would stabilize or increase lot sales or lot prices. Such a relationship between the Debtor and Capital is neither foreseeable, nor believable. Therefore, the Court gives this analysis little weight.

The competition for sales between the debtor and the secured lender was not a factor in *Bannerman*. In *Bannerman*, the debtor agreed to delay the sale of three (3) of the four (4) units it intended to retain for a period of eighteen (18) months.[12] Case No. 10-01053-8-SWH at 2 (Bankr. E.D.N.C. October 20, 2010). As such, the competition between the debtor and the secured lender was minimal as the debtor would only have one (1) unit for sale during the first eighteen (18) months. *Id.* The debtor surrendered eleven (11) units to the secured lender which would have the option to liquidate the collateral at its discretion. *Id.*

Furthermore, in *Bannerman*, the appraiser was able to use five (5) comparable sales that occurred within thirteen (13) months of his appraisal. *Id.* at 10. Although the court discounted three (3) of the comparables, it was able to analyze the differences in the properties to determine which of those properties were best suited for comparison and valuation. Here, there are no comparable properties. The Debtor has failed to sell any of its lots within the past year and presented little evidence comparing the completed lots, the partially developed lots, and the raw land to current sales of similar properties within the past year.

---

[12] In addition, the debtor in *Bannerman* also agreed to remove the guarantor release language from its proposed plan. Case No. 10-01053-8-SWH (Bankr. E.D.N.C. October 20, 2010). By removing this provision, the secured lender was protected from an all or nothing deal and had the opportunity to collect any deficiency from the guarantors. It also shows a level of confidence on the part of the debtor that it believes in the accuracy of its appraiser. However, the Debtor in this case has not offered to remove the guarantor release language from its Plan.

Therefore, based on the facts in this case, this Court will not perform a substantial extrapolation of the appraisal and valuation testimony that was presented. Valuation of the specific property that the Debtor proposes to surrender is critical to the determination of whether Capital would be, in fact, receiving the indubitable equivalent of its claim and the burden to present such evidence is on the Debtor.

Without competent, expert evidence of the value of the property to be surrendered, testimony as to the impact of Capital and the Debtor competing as sellers in the Project, and the lack of funding for the construction of the amenities, the Debtor has failed to prove that its proposed treatment of Capital equals the indubitable equivalent of its claim by even a preponderance of the evidence. Under Option Two, Capital will not receive the indubitable equivalent of its claim. The claim of Capital does not receive fair and equitable treatment under 11 U.S.C. § 1129(b)(2)(A)(iii).

Therefore, the confirmation of the Plan is **DENIED**.

**SO ORDERED.**

### END OF DOCUMENT